UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

v.

JOSE D. DE LA ROSA,
a/k/a "Carlos A. Gomez-Pirela,"
a/k/a "El Negro,"
a/k/a "Yiyo,"
GABRIEL CASTILLO-MARTINEZ,
a/k/a "Green Eyes,"
MARCELO MONTILLA and
ROBERTO OLIVO-ESTRELLA,

Defendants.

DECISION & ORDER and
REPORT & RECOMMENDATION

06-CR-6042L

**PRELIMINARY STATEMENT**

By Order of the Hon. David G. Larimer, United States District Judge, dated March 22, 2006, all pretrial matters in the above-captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B). (Docket # 2).

Defendants Jose De La Rosa, Gabriel Castillo-Martinez, Marcelo Montilla and Roberto Olivo-Estrella have been charged in a single-count indictment. The indictment charges that between June 2002 and December 2004, the defendants conspired to possess with intent to distribute and to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 846. In addition, the indictment also asserts forfeiture allegations against them. (Docket # 4).

Defendants De La Rosa, Castillo-Martinez and Montilla have filed pretrial motions, the majority of which have been resolved by the parties or decided in open court. (Docket ## 61, 80, 87). Defendant Olivo-Estrella has not yet filed pretrial motions with the Court. Currently pending for Decision and Order is Montilla's motion for a bill of particulars. Also before the Court for Report and Recommendation are motions by De La Rosa, Castillo-Martinez and Montilla to suppress evidence relating to various photographic identifications. The following constitutes this Court's Decision and Order and Report and Recommendation on the pending motions.

## FACTUAL BACKGROUND

Evidentiary hearings relating to defendants' suppression motions were conducted before this Court on November 16, 2007, January 4, 2008 and January 8, 2008.[1] At each of the hearings, Todd Overhoff, a Special Agent with the Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), testified. No witnesses were called by any of the defendants. The following is a summary of the credible evidence presented during the various hearings.

**Photographic Identifications of Jose De La Rosa**

[1] The transcript of the evidentiary hearing conducted before this Court on November 16, 2007 (Docket # 105) shall hereinafter be referenced as "Tr.A __." The transcript of the evidentiary hearing conducted before this Court on January 4, 2008 at 12:00 p.m. (Docket # 118) shall hereinafter be referenced as "Tr.B __." The transcript of the evidentiary hearing conducted before this Court on January 4, 2008 at 2:00 p.m. (Docket # 106) shall hereinafter be referenced as "Tr.C __." Finally, the transcript of the evidentiary hearing conducted before this Court on January 8, 2008 (Docket # 117) shall hereinafter be referenced as "Tr.D __."

Special Agent Overhoff testified that during the investigation of this matter, he conducted several photographic identifications of De La Rosa with three unidentified witnesses, hereinafter referred to as "CW-1," "CW-2" and "CW-3."[2] (Tr.A 4). The circumstances of each of the meetings in which an identification of De La Rosa was made are described below. According to Overhoff, during each of those meetings, the identifying witness appeared coherent and sober, and no one present suggested to or instructed the witness that any photographs in particular should be identified. (Tr.A 12-13, 19-20, 22).

**CW-1:** Agent Overhoff met with CW-1 on two occasions during which he showed him photographic arrays containing photographs of De La Rosa. The first was a debriefing session on April 8, 2005 that took place in the United States Attorney's Office. Assistant United States Attorney ("AUSA") Frank Sherman and another investigating agent were also present. On this occasion, CW-1 was presented with a two-page photographic array and asked whether he recognized any of the individuals depicted. (Tr.A 5-6, 14; G.Ex. 1). The array contained seventy different one-by-one inch photographs, depicting frontal images of men and women from the neck up; the individuals shown had differing hair styles, skin tones and facial hair. (Tr.A 22; G.Ex.1). Approximately half of the individuals depicted were persons suspected of being involved in the narcotics conspiracy under investigation, and many had been discussed by CW-1 during previous conversations he had with the investigating agents. (Tr.A 35, 39).

According to Overhoff, AUSA Sherman advised CW-1 that he would be presented with various photographs that he should carefully review, keeping in mind that certain features, such as hair or facial hair can change. Sherman told CW-1 to concentrate on permanent

[2] The government has identified CW-1 and CW-3 as males and CW-2 as female. (Tr.A 17; Tr.B 15).

features, such as the eyes and nose. (Tr.A 14-15). Following these instructions, CW-1 reviewed both pages of the seventy-photograph array and identified an unspecified number of the individuals depicted. (Tr.A 15, 26; G.Ex. 1). CW-1 specifically identified the individual depicted in photograph number 8 as De La Rosa.[3] (Tr.A 15).

On June 13, 2006, Overhoff conducted another identification procedure involving CW-1. This meeting occurred at a federal correctional institution. (Tr.A 6-8). Specifically, Overhoff testified that he met with CW-1 in an office of the correctional facility and advised him that he had multiple photographic arrays that he wanted the witness to review. (Tr.A 12). Again, Overhoff directed CW-1 to examine each individual photograph and to focus on permanent features, such as the eyes and nose. (Tr.A 12). Overhoff then displayed approximately twenty photographic arrays to CW-1 in serial fashion, each of which contained six or eight black and white photographs. (Tr.A 6, 11-12, 28-29; G.Ex. 2). The array containing the photograph of De La Rosa was somewhere in the middle of the group of arrays displayed. (Tr.A 11). It contained six photographs depicting the heads and shoulders of six men with similar physical features. (G.Ex. 1). Among other identifications, CW-1 identified the photograph of De La Rosa and wrote the names "Negro" and "Carlos" next to it. (Tr.A 9-10; G.Ex. 2).

**CW-2:** On January 17, 2006, Overhoff participated in a proffer session with CW-2 that was held in the United States Attorney's Office. The following individuals were also present: AUSA Sherman, ICE Special Agent Petrone, Detective David Simpson of the Rochester Police Department, CW-2's attorney and an interpreter. (Tr.A 18). During this meeting, CW-2

[3] Although the seventy-photograph array was displayed to CW-1 on several subsequent occasions, the April 8, 2005 identification was the first time the witness reviewed that array. (Tr.A 16, 41; Tr.C 4-5).

reviewed the seventy-photograph array. Before doing so, CW-2 was instructed to review the photographs, bearing in mind that certain features can change, and to indicate whether she recognized anyone. (Tr.A 18). Upon reviewing the array, CW-2 identified several of the photographs, including one of De La Rosa, whom she knew as "Carlos." (Tr.A 18-20, 32). On a photocopy of the array, CW-2 wrote the name "Carlos" next to photograph 8. (Tr. 19).

**CW-3:** On March 6, 2006, Overhoff displayed the seventy-photograph array to a third witness, CW-3. This identification procedure also occurred during a proffer session in the United States Attorney's Office – this one attended by AUSA Sherman, ICE Special Agent Raymond Villanueva and an attorney for CW-3, in addition to CW-3 and Overhoff. (Tr.A 20). As with the previous witnesses, CW-3 was instructed to review each of the photographs depicted in the array, specifically concentrating on permanent features such as the eyes, nose and mouth. (Tr.A 21). After reviewing the array, CW-3 identified several of the photographs, one of which was photograph number 8. CW-3 stated that he knew the person in photograph number 8 by the names "Carlos," "Negro," "Moreno," and "Yiyo." (Tr.A 22).

**Photographic Identifications of Marcelo Montilla**

Overhoff also participated in three photographic identifications of defendant Marcelo Montilla by three unidentified witnesses: CW-4, CW-5 and CW-6.[4] Copies of the same

[4] CW-4 is a female witness, and CW-5 and CW-6 are males.

The government has not indicated whether any of the three witnesses who participated in the identifications of Marcelo Montilla were the same as those who identified De La Rosa, although it appears from the date and location of the third identification that the first witness to identify De La Rosa ("CW-1") and the witness who identified Montilla on June 13, 2005 may be the same individual. Because that question cannot be resolved on the factual record before me, I will refer to the witness who identified Montilla on that date as "CW-6."

photographic array were used during each of the three procedures. (Tr.B 4). The array contained black and white photographs of six men, who were depicted in frontal images from the shoulders to the top of the head. All of the men appear to be of similar age and coloring, and each has relatively short-cut hair. The photograph of Montilla shows him with a faint mustache, a feature that appears to be shared by most of the others depicted. (G.Exs. 1, 2).

**CW-4:** The identification procedure involving CW-4 occurred during a proffer session conducted in the United States Attorney's Office on March 20, 2006, attended by Overhoff, Detective Simpson, AUSA Sherman, the witness and an interpreter. (Tr.B 4-5). At that time, CW-4 appeared sober and coherent. (Tr.B 7). According to Overhoff, CW-4 was presented with several different photographic arrays, displayed one at a time, and instructed to look at each photograph carefully and to indicate whether she could identify any of the people depicted. Overhoff testified that nobody present during the proffer session indicated who might be depicted in the photographic arrays, nor did anyone suggest to CW-4 which of the photographs she should closely examine. CW-4 was advised not to focus on physical characteristics that were subject to change, but to concentrate on permanent features, such as the eyes, nose and mouth. (Tr.B 5-6). When presented with the array containing a photograph of Montilla, CW-4 identified his photograph as "Marcelo" (Montilla's first name).[5] (Tr.B 6; G.Ex. 1). CW-4 circled the number above Marcelo's photograph, wrote "Marselo" [*sic*] under the picture and signed the array. (Tr.B 6; G.Ex. 1).

[5] According to a January 15, 2008 letter from AUSA Sherman to Montilla's attorney (the "January 15, 2008 letter"), the photospread containing Montilla's photograph was the second array displayed to CW-4 that day.

**CW-5:** The identification procedure involving CW-5 was conducted on March 21, 2006, also during a proffer session conducted in the United States Attorney's Office. (Tr.B 8). The same agents and prosecutor, along with an agent from the Drug Enforcement Administration, attended the meeting with CW-5. (Tr.B 8). As with the previous witness, CW-5 was presented with several photographic arrays and instructed to look at them carefully, paying particular attention to the permanent facial features of the individuals depicted. (Tr.B 9). He was not instructed to focus upon any particular photograph. (Tr.B 10). Upon reviewing the array containing Montilla's photograph, CW-5 identified his photograph, circled the number above it and wrote the name "Marcelo Montilla" under it.[6] (Tr.B 10; G.Ex. 2).

**CW-6:** The third identification procedure relating to Montilla occurred on June 13, 2006, at a correctional facility in the state of Florida. Overhoff met alone with CW-6, who was incarcerated at the time. (Tr.B 12). During the meeting, Overhoff displayed several photographic arrays to CW-6, one of which was the array that included the picture of Montilla.[7] Overhoff instructed CW-6 to review each of the photographs carefully, paying particular attention to permanent facial features. (Tr.B 13). Again, Overhoff did not suggest who might be depicted in the array; nor did he suggest that CW-6 concentrate on any photographs in particular. (Tr.B 14). CW-6 identified the picture of Montilla and then circled the number corresponding to Montilla's photograph and wrote "Marcelo Montilla" underneath it. (Tr.B 13-14).

---

[6] According to the January 15, 2008 letter, this array was the first of the arrays shown to CW-5 that day.

[7] According to the January 15, 2008 letter, this array was the thirteenth displayed to CW-6 that day.

**Photographic Identifications of Castillo-Martinez**

Photographs of defendant Castillo-Martinez also were identified by three confidential witnesses.[8] As with Montilla, copies of the same photographic array were used during each of three procedures. (Tr.D 9). The array containing Castillo-Martinez's photograph included six black and white photographs depicting the head and shoulders of male individuals. Each man appeared to be of similar age and coloring and had similarly short-cut hair. (Tr.D, G.Ex. 1).

**CW-7:** The identification procedure involving CW-7 occurred during a proffer session in the United States Attorney's Office on April 27, 2006, attended by AUSA Sherman, Overhoff and another ICE agent, CW-7, his attorney and an interpreter. (Tr.D 9-10). CW-7 was presented with approximately eight different photographic arrays and instructed to review each one, keeping in mind that certain physical characteristics may have changed and to focus on permanent features, such as the nose, eyes, ears and mouth. (Tr.D 10, 22). When presented with the black and white array containing a photograph of Castillo-Martinez, CW-7 identified his photograph as someone he knew as "Gabriel" and "Green Eye."[9] (Tr.D 11). Overhoff testified that neither he, nor any of the others present, indicated to CW-7 who would be included in the

---

[8] The government has not indicated whether any of the three witnesses who identified Castillo-Martinez were the same as those who identified either Montilla or De La Rosa. The date and place of the identification by the second witness suggests that he may be the same person who identified De La Rosa on June 13, 2005 ("CW-1") and Montilla on the same date ("CW-6"). Because that fact cannot be confirmed, he will be referred to as "CW-8." In addition, although the gender of these witnesses is not known, for ease of reference, the Court will refer to all three witnesses using the male pronoun.

[9] According to a January 18, 2008 letter from AUSA Sherman to Castillo-Martinez's attorney (the "January 18, 2008 letter"), this array was the fifth photospread presented to the witness on that day.

arrays; nor did anyone suggest to the witness that he should concentrate on any photographs in particular. (Tr.D 11).

**CW-8:** The second identification procedure involved CW-8 and occurred in a federal correctional facility in Florida on June 13, 2006. (Tr.D 12-13). Overhoff had met with CW-8 on occasions prior to this meeting and had discussed with him various individuals whom the witness believed were involved in narcotics trafficking. Overhoff testified that it was possible that CW-8 had previously provided a physical description of Castillo-Martinez.[10] (Tr.D 38). During their June 13, 2006 meeting, Overhoff displayed various photographic arrays to the witness without indicating to him who might be included in the arrays or which of the particular photographs should be examined most closely. (Tr.D 13). Overhoff instructed the witness to review each photograph carefully and to focus on permanent facial features. (Tr.D 15). When CW-8 reviewed the array containing a photograph of Castillo-Martinez, he identified Castillo-Martinez's photograph. Next to the defendant's picture, CW-8 wrote the notations "Green Eye" and "Chabelo."[11] (Tr.D 13-14; G.Ex. 1).

**CW-9:** The final identification procedure occurred on August 17, 2006, during a proffer session in the United States Attorney's Office, attended by Overhoff, Detective Simpson, AUSA Sherman, CW-9, his attorney and an interpreter. (Tr.D 16). CW-9 was provided with instructions similar in substance to those provided to CW-7 and CW-8 and was then shown

---

[10] Indeed, according to the January 18, 2008 letter, the witness had provided physical descriptions of Castillo-Martinez on two occasions three years prior to the photographic identification on June 13, 2006.

[11] The January 18, 2008 letter states that the photospread of Castillo-Martinez was the nineteenth one displayed.

approximately sixteen separate arrays.[12] (Tr.D 17-18, 39). The last array displayed to CW-9 contained a photograph of Castillo-Martinez, which the witness indicated that he recognized. (Tr.D 40). CW-9 circled the number above Castillo-Martinez's picture and wrote the names "Gabriel Castillo" and "Green Eye" underneath it. (Tr.D 19; G.Ex. 2).

**DECISION AND ORDER**

Before this Court for Decision and Order is Montilla's motion for a bill of particulars. (Docket # 87). The purpose of a bill of particulars is to enable the defendant "to identify with sufficient particularity the nature of the charge pending against him, thereby enabling [the] defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (citations omitted) (per curiam). A bill of particulars is not to be used as a discovery device to obtain "evidentiary detail" about the government's case. *See*, *e.g.*, *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990) (citation omitted). In other words, a bill of particulars should be granted where the information sought is "necessary" to prepare a defense and to avoid double jeopardy, not where it is merely "useful" to the defense in ascertaining the government's proof. *See United States v. Henry*, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994); *see also United States v. Love*, 859 F. Supp. 725, 738 (S.D.N.Y.), *aff'd sub nom. United States v. Roberts*, 41 F.3d 1501 (2d Cir. 1994). Where the charge against the defendant is broad in scope, a bill of particulars may be more appropriate than where the

[12] The January 18, 2008 letter states that seventeen arrays were shown and that the array with the defendant's photograph was the last displayed.

charged conduct is more narrow. *See*, *e.g.*, *United States v. Barnes*, 158 F.3d 662, 666 (2d Cir. 1998) ("a bill of particulars or other adequate disclosure is appropriate where a conspiracy count covers a complex series of events over a number of years, but provides only the bare bones of the charge").

To warrant a bill of particulars, the indictment's charges against a defendant must be so general that they fail to advise him or her of the specific acts of which they are accused. *See United States v. Torres*, 901 F.2d at 234; *United States v. Henry*, 861 F. Supp. at 1198. In determining that question, the court may consider whether the information sought by the defendant has been made available in alternative forms, such as in discovery or prior court proceedings. *See United States v. Panza*, 750 F.2d 1141, 1148 (2d Cir. 1984); *United States v. Kelly*, 91 F. Supp. 2d 580, 583-84 (S.D.N.Y. 2000); *United States v. Ahmad*, 992 F. Supp. 682, 684 (S.D.N.Y. 1998); *United States v. Feola*, 651 F. Supp. 1068, 1133 (S.D.N.Y. 1987), *aff'd*, 875 F.2d 857 (2d Cir.), *cert. denied*, 493 U.S. 834 (1989).

In this case, Montilla has been provided with voluntary discovery, which the government asserts adequately advises him of the charges against him and the nature of the government's case. (Docket # 92). In addition to that discovery, a detention hearing was conducted, during which the government provided various details relating to a narcotics transaction involving Montilla that is alleged to have been conducted in furtherance of the charged conspiracy. Specifically, the government indicated that it intends to prove at trial that in November 2002, Montilla received approximately 24 kilograms of cocaine from a shipment of

150 kilograms that was delivered to Jose Castillo-Martinez in New York City.[13] Montilla's co-defendants Jose De La Rosa and Gabriel Castillo-Martinez also are alleged to have received a portion of the shipment delivered to Jose Castillo-Martinez. (Docket # 99 at 2). During the several weeks following Montilla's receipt of the cocaine, he allegedly made partial payments for the narcotics of at least $70,000 to Frank DeJesus, who was working with Jose Castillo-Martinez. (*Id.* at 3). On this record, I find that Montilla has sufficient information to prepare his defense, to avoid unfair surprise and to interpose a claim of double jeopardy, if appropriate. *See United States v. Bortnovsky*, 820 F.2d at 574. Accordingly, Montilla's motion for a bill of particulars is denied.

**REPORT AND RECOMMENDATION**

Also before this Court for Report and Recommendation are motions by De La Rosa, Montilla and Castillo-Martinez to suppress testimony relating to the photographic identification procedures. (Docket ## 61, 80, 87). An out-of-court photographic identification will be suppressed under the Due Process Clause if it was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968); *see also Stovall v. Denno*, 388 U.S. 293, 301-02 (1967).

In determining whether to exclude a pretrial identification, the court must undertake a two-step analysis. First, the court must consider whether the identification procedure

[13] In addition, the government has indicated that it intends to offer evidence of an intercepted telephone conversation in October of 2002 between Jose Castillo-Martinez and Juan Castillo in which they discussed the fact that Montilla was "up north and waiting for a delivery." (Docket # 99 at 5). According to the government, Montilla was living in Milwaukee, Wisconsin at the time. (*Id.*).

was unduly suggestive. If so, the court then must determine whether the identification nevertheless possesses "sufficient aspects of reliability." *United States v. Bubar*, 567 F.2d 192, 197 (2d Cir.) (citing *Manson v. Brathwaite*, 432 U.S. 98, 109-17 (1977)), *cert. denied*, 434 U.S. 872 (1977). "Even if the procedure was unnecessarily (or impermissibly) suggestive, therefore, a district court may still admit the evidence 'if, when viewed in the totality of the circumstances, it possesses sufficient indicia of reliability.'" *United States v. Bautista*, 23 F.3d 726, 729-30 (2d Cir.) (footnote omitted) (quoting *United States v. Simmons*, 923 F.2d 934, 950 (2d Cir.), *cert. denied*, 500 U.S. 919 (1991)), *cert. denied*, 513 U.S. 862 (1994).

At the government's request, this Court conducted bifurcated *Wade* hearings.[14] To date, the government has offered evidence relating only to the issue of the suggestiveness of the identification procedures utilized. No continuation of the hearings is necessary if the Court finds the identification procedures were not unduly suggestive. If, to the contrary, the Court finds the procedures were impermissibly suggestive, a continuation of the hearings would be warranted to determine whether the witnesses who made the identifications had an independent basis upon which to do so.

**A. <u>Identifications of Montilla and Castillo-Martinez</u>**

Taking first the photographic identification procedures pertaining to Montilla and Castillo-Martinez, I find that they were not impermissibly suggestive. On each occasion, appropriate, non-suggestive instructions were communicated to the witness, advising him or her

---

[14] A *Wade* hearing refers to a hearing held pursuant to *United States v. Wade*, 388 U.S. 218 (1967), to determine whether an out-of-court identification resulted from an impermissibly suggestive procedure and, if so, whether it is independently reliable.

to review a series of photographic arrays and to indicate whether he or she recognized any of the individuals depicted. (Tr.B 5-10, 13-14; Tr.D 9-11, 13, 15-17, 22, 40). The various arrays displayed to the witnesses contained an appropriate number of photographs (varying from six to eight). The arrays containing Montilla's and Castillo-Martinez's photographs also contained photographs of other men with similar physical characteristics (age, complexion, facial hair, hair style and hair length). All were black and white photographs taken from a similar perspective (frontal image from the shoulders up). (Tr.B, G.Ex.1; Tr.D, G.Ex 1). Although multiple arrays were shown to each witness, resulting in the identification of other suspects, Montilla and Castillo-Martinez were the only individuals depicted in their respective arrays who were suspected of involvement in the alleged conspiracy. (Tr.B 17; Tr.D 11). *See United States v. Marrero*, 705 F.2d 652, 655 n.5 (2d Cir. 1983) (six is an acceptable number for a photographic array); *United States v. Joseph*, 332 F. Supp. 2d 571, 582 (S.D.N.Y. 2004) (photographic array was not unduly suggestive where array contained six photographs of individuals of similar ethnicity, age, hairstyle and facial hair). Moreover, nothing in the record suggests that any of the other identifications tainted the identifications of Montilla or Castillo-Martinez.

On this record, I find that the circumstances surrounding the photographic identifications of Montilla and Castillo-Martinez did not give rise to "a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. at 384. *See, e.g.*, *United States v. Maldonado-Rivera*, 922 F.2d 934, 974 (2d Cir. 1990) ("fairness of a photograph array depends upon number of factors, including the size of the array, the manner of presentation by the officers, and the array's contents"), *cert. denied*, 501 U.S. 1233 (1991); *see also United States v. Thai*, 29 F.3d 785, 808 (2d Cir.) ("principal question is whether the picture

of the accused, matching descriptions given by the witness, so stood out from all the other photographs as to 'suggest to an identifying witness that [that person] was more likely to be the culprit'") (quoting *Jarrett v. Headley*, 802 F.2d 34, 41 (2d Cir. 1986)), *cert. denied*, 513 U.S. 993 (1994). I therefore recommend that Montilla's and Castillo-Martinez's motions to suppress testimony relating to the identifications be denied.

**B. <u>Montilla's Motion to Reopen the Suppression Hearing</u>**

Following the *Wade* hearing, and pursuant to this Court's direction, the government located notes of the proffer sessions involving the witnesses who identified Montilla. By letter dated January 15, 2008, from AUSA Sherman to Montilla's attorney (the letter previously referred to as the "January 15, 2008 letter"), the government provided to defense counsel a description of relevant portions of these notes. Montilla now moves to reopen the *Wade* hearing on the grounds that CW-6 had described Montilla during a previous session as a Dominican male, 6 foot 3 inches or 6 foot 2 inches in height and 210 pounds in weight, when in fact, Montilla is approximately 5 foot 11 inches and 145 pounds. (Docket # 112).

Montilla's motion to reopen the hearing (Docket # 112) is denied. Although CW-6's physical description of Montilla is a proper subject of cross-examination at trial, it does not call into question the validity of the procedures followed by Agent Overhoff in his meeting with CW-6. Regardless of CW-6's ability to estimate height and weight, he correctly identified Montilla's photograph among others with similar physical characteristics. Significantly, none of the photographs in the array, which were head and shoulder images, provided any means for determining the height or weight of the individuals depicted. In the absence of any basis to find

that either the instructions or the array were suggestive, reopening the hearing is not justified. Accordingly, Montilla's motion to reopen is denied.

**C. <u>Castillo-Martinez's Motion for Disclosure of the Notes</u>**

Following Castillo-Martinez's hearing, the government also provided a letter to his attorney, dated January 18, 2008 (previously referred to as the "January 18, 2008 letter"), summarizing certain information in the government's reports and notes relating to the meetings with CW-7, CW-8 and CW-9. Castillo-Martinez now seeks disclosure of the actual notes.

That application is denied. This Court reviewed the government's reports and notes *in camera* to determine the accuracy and adequacy of the disclosures made in the January 18, 2008 letter. Considering that review, and the fact that the notes and reports contain other information not discoverable at this time, defendant's application is denied at this time.

**D. <u>Identifications of De La Rosa</u>**

The question of the suggestiveness of the procedures used during the identifications of De La Rosa is a much closer one, principally because of the very different features of the photo display shown to the witnesses who identified him. Specifically, instead of displaying individual arrays of six or eight photographs, the investigating team showed the witnesses a two-page spread containing seventy photographs, approximately half of which depicted suspects in the investigation. In addition, the displays were shown to the witnesses at some point during the course of debriefing or proffer sessions with them concerning the

investigation. The record does not reveal how extensively the witnesses were debriefed prior to the identification procedures.

As an initial matter, I reject De La Rosa's contention that the two-page spread was suggestive because his picture was darker and its resolution less sharp than the others. All of the photographs in the array were in color, were approximately the same size and only varied slightly in visual quality. De La Rosa's photograph does not stand out among the others "as to suggest to [the] identifying witness[es] that [he] was more likely to be the culprit." *United States v. Thai*, 29 F.3d at 808 (internal quotations omitted). *See United States v. Eltayib*, 88 F.3d 157, 166 (2d Cir. 1996) (quoting *Thai*, 29 F.3d at 808). *See also United States v. Bautista*, 23 F.3d at 731 (photographic array was not impermissibly suggestive despite fact that defendant's photograph was slightly brighter and more close-up than the others). The Due Process Clause does not require law enforcement "to scour about for a selection of photographs so similar in their subject matter and composition as to make subconscious influences on witnesses an objective impossibility." *United States v. Bubar*, 567 F.2d at 199 (fact that defendant's photograph was sharper in definition and reflected a narrow strip of light across the defendant's head does not render array suggestive); *Ennis v. Walker*, 2001 WL 409530, *20 (S.D.N.Y. 2001) (appearance of black bar under defendant's photograph does not render array unduly suggestive). I conclude that when viewing the array as a whole, De La Rosa's photograph was not so different as to suggest his culpability.

Turning next to the more general features of the array, the array contained seventy different one-inch by one-inch colored photographs of men and women. (Tr.A 22; G.Ex.1). Unlike the six or eight-photograph arrays, the seventy-photograph spread did not contain a single

picture of one suspect, along with photographs of other non-related individuals with similar physical attributes. Rather, as Overhoff testified, approximately half of the individuals depicted were suspected of being involved in the narcotics conspiracy under investigation, and many had been the subject of discussion between the witnesses and the agents. (Tr.A 35, 39). The array contains photographs of persons who appear to be Hispanic, some who appear to be Caucasian and some who appear to be African-American; fifteen of the seventy appear female; the age range of those depicted appears substantial, as do their physical features.

The potential for suggestiveness here arises from a combination of factors: the inclusion of the array of an equal number of suspects and non-suspects; the disparity of physical features depicted; and, the use of the array during debriefing or proffer sessions. Stated another way, the array would be less troubling if its ratio of suspects to non-suspects were larger; if it contained a greater number of individuals with similar features; and, if the record were clear that it had been presented to the witnesses at the beginning of the sessions, rather than at a time when the witnesses' focus could have been directed to persons whom he had just discussed. On the other hand, the spread did contain a large number of photographs displayed at the same time, which militates against a finding of suggestiveness, *see United States v. Shakur*, 570 F. Supp. 333, 335 (S.D.N.Y. 1983) (137 photographs "was sufficiently large to avoid any suggestiveness") and was accompanied by appropriate instructions, *see id.* at 333 (noting appropriate instructions).

On this record, I determine that the prudent course is to conduct the second stage of the *Wade* hearing to ascertain whether the witnesses have an independent basis upon which to

make reliable identifications of the defendants.[15] *See Bubar*, 567 F.2d at 197 (where "the indicia of suggestiveness appear[ed] to point in both directions," court relied upon witness' independent basis for in-court identification). Counsel for the government is directed to contact this Court promptly following the district court's scheduling of a trial date in order to set a date for the continuation of this hearing (assuming defendant De La Rosa is still among those to be tried).

## CONCLUSION

For the foregoing reasons, it is hereby ordered that Montilla's motion for a bill of particulars **(Docket # 87)** is **DENIED**. In addition, it is my recommendation that Montilla's and Castillo-Martinez's motions to suppress testimony relating to photographic identification procedures **(Docket ## 80, 87)** be **DENIED.** It is my further recommendation that the *Wade* hearing be continued on a date to be later determined in order to consider the independent reliability of the identifications of defendant De La Rosa made by the government's witnesses on April 8, 2005, January 17, 2006 and March 6, 2006. **(Docket # 61)**.

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
May 2, 2008

[15] I am not prepared to say that CW-1's June 13, 2006 identification is reliable in the absence of testimony from CW-1. That identification occurred after, not before, the identification from the two-page spread. Of course, if CW-1 is found to have an independent basis for his identification of De La Rosa, an evaluation of the suggestiveness of the June 13, 2006 procedure will be unnecessary. If, however, CW-1 is found not to have an independent basis for identification, then it will be necessary for the Court to consider what effect, if any, the prior procedure may have had on the subsequent identification.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York.[16]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 58.2(a)(3) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
May 2 , 2008

[16] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(F) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the ten days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).